IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| PLAINTIFF A, by his natural mother and general guardian, PARENT A, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 21-cv-6153-SRB |
| PARK HILL SCHOOL DISTRICT, et al., | ) ) | |
| Defendants. | ) ) | |

## ORDER

Before the Court is Plaintiff A, Plaintiff B, Plaintiff C, and Plaintiff D's (collectively, "Plaintiffs")[1] Motion for Temporary Restraining Order or in the Alternative for a Preliminary Injunction. (Doc. #7.) Plaintiffs request the Court to "readmit [Plaintiffs A, B, C, and D] to Park Hill South High School with . . . full privileges" and "that all school records regarding any disciplinary measures taken . . . be temporarily removed . . . as well as an order prohibiting Defendants from further violating the rights of Plaintiffs A, B, C, and D." (Doc. #7, p. 1.) On January 31, 2022, the Court presided over a preliminary injunction hearing. Upon consideration of the entire record, and for the reasons stated below, Plaintiffs' motion for a preliminary injunction is DENIED.

I.  BACKGROUND

Defendant Park Hill School District ("Park Hill SD") is a public school district in Platte County, Missouri.[2] Defendants Janice Bolin ("Bolin"), Bart Klein ("Klein"), Kimberley Ried

---

[1] The minor Plaintiffs and their parents proceed anonymously pursuant to the Court's prior order (Doc. #5).

[2] The following facts are taken from the complaint, the parties' briefing and exhibits, and the preliminary injunction hearing.

("Ried"), Todd Fane ("Fane"), Scott Monsees ("Monsees"), Susan Newburger ("Newburger"), and Brandy Woodley ("Woodley") are members of the Park Hill School District Board of Education ("the School Board"). Also named as defendants are Dr. Jeanette Cowherd ("Dr. Cowherd"), the Superintendent of Park Hill SD; Dr. Josh Colvin ("Dr. Colvin"), the Director of Student Services at Park Hill SD; and Dr. Kerrie Herren ("Dr. Herren"), the Principal at Park Hill South High School (collectively, "Defendants").

As of September 16, 2021, Plaintiffs were in ninth grade at Park Hill South High School ("PHS"). "Plaintiff A is biracial, Black and Brazilian[,]" and, as of September 16, 2021, he was fifteen years old. (Doc. #1, p. 6.) "Plaintiff B is White[,]" and, as of September 16, 2021, he was fourteen years old. (Doc. #1, p. 6.) "Plaintiff C is White[,]" and, as of September 16, 2021, he was fourteen years old. (Doc. #1, pp. 6–7.) "Plaintiff D is biracial, White and Asian[,]" and, as of September 16, 2021, he was fourteen years old. (Doc. #1, p. 7.) Plaintiffs were part of PHS's ninth grade football team ("the football team") and attended the summer football camp and school practices. Plaintiffs allege that the use of racial slurs was common at PHS, "most often in friendly bantering[,]" and that racial slurs were "often used in the locker room within the hearing of coaches or other adults and was most often tolerated by those adults." (Doc. #1, p. 12.)

On September 16, 2021, Plaintiffs traveled on a school bus to an afternoon away football game. Plaintiffs A, B, and C were on one of the two busses ("Bus One") together, while Plaintiff D was on the second of the two busses ("Bus Two"). While travelling to the game, the football team members were sending Snapchat messages and videos back-and-forth between Bus One and Bus Two. Plaintiff A and another student on the football team, Student X, "were engaging in playful bantering about jobs and slaves, a subject first mentioned by Student X to Plaintiff A." (Doc. #1, p. 13.) Student X is Black. Plaintiff A drafted a petition on Change.org titled "Start

slavery again" ("the Petition").  Plaintiff A showed the Petition to the students "seated near him, including Student X[,]" who "all laughed about it and encouraged Plaintiff A to post it, which he did."  (Doc. #1, pp. 13–14.)

Plaintiff A, after "encouragement" by another teammate, shared the Petition to the football team's Snapchat group.  (Doc. #1, p. 14.)  After sharing the Petition, the students arrived at their destination and participated in the football game.  At some point that day, other members of the football team "liked" the Petition.[3]  Plaintiffs commented on the Petition.  Plaintiff A commented that a fellow black student "needs a job."  Plaintiff B commented "I love slavery."  Plaintiff C commented "I hate blacks."  Plaintiff D commented "I want a slave."  "The ninth graders who posted, liked, or commented on the [Petition], as well as [Student X], who participated in the creation and sharing of the [Petition], viewed it as a joke and those who commented on it wanted to be in on the joke."  (Doc. #1, p. 15.)

Members of the Snapchat group shared the Petition, bringing it to the community's and Defendants' attention.  On September 17, 2021, the next day, PHS interviewed Plaintiffs, who "all admitted their participation, characterizing it as a joke."  (Doc. #1, p. 15.)  The same day, Plaintiffs were suspended from PHS for ten days for violating multiple school policies: cell phone use, disorderly conduct, disruptive behavior, and harassment.  Park Hill SD's policy states that the "code of conduct . . . . will apply to all students in attendance in the district's instructional and support programs as well as at district-sponsored activities."  (Doc. #27-22, p. 1.)  The policy provides that a student "may be disciplined for misconduct that occurs off district grounds and outside a district activity[,]" among other situations, when "[t]he student's conduct negatively

---

[3] Change.org allows users to indicate they support a petition by clicking a "like" button.

3

impacts the education environment or there is a nexus to the education environment." (Doc. #27-22, p. 2.)

The day after Plaintiff A posted the Petition, Dr. Herren, the Principal of PHS, emailed the staff and parents of PHS students notifying them of "some unacceptable and racist statements that some students posted online during a school-related activity." (Doc. #64-20.) News outlets started reporting on the Petition and the story drew national attention. As is often the case, the story went viral without all the facts. Defendants felt restrained to not tell the complete story due to Family and Education Rights and Privacy Act of 1974 ("FERPA"), 28 U.S.C. § 1232g, and did not identify that the racist comments were made by both mixed-race and white students. Defendants were aware that, based on Defendants' public comments, "[e]veryone has assumed these kids were all white." (Doc. #64-22.) On September 22, 2021, Dr. Cowherd, Superintendent of Park Hill SD, emailed a letter to the community condemning the Petition. (Doc. #1, p. 16.) The letter implied that Plaintiffs were facing suspension or expulsion. (Doc. #64-23.) On November 3, 2021, the School Board held a hearing, which resulted in the expulsion of Plaintiff A and suspension of Plaintiffs B, C, and D for 180 days.

Plaintiffs then filed this suit against Defendants pursuant to 42 U.S.C. § 1983 for violations of the First Amendment, the Fourteenth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause, and failure to train and supervise or inadequate training or supervision. Plaintiffs seek actual damages, nominal damages, attorney's fees and costs, punitive damages, a preliminary injunction permitting Plaintiffs to return to school and make up for missed educational opportunities, and a permanent injunction expunging Plaintiffs' school records and prohibiting further violations of Plaintiffs' constitutional rights.

Plaintiffs argue that a preliminary injunction is warranted under the facts presented. Defendants disagree. The Court address the parties' arguments below.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a), the Court may issue a preliminary injunction. "A preliminary injunction is an extraordinary remedy . . . and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted). A preliminary injunction may be issued upon a showing of:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

"At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id*. Generally, all four *Dataphase* factors must be examined "to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citations and quotations omitted). However, "the likelihood of success on the merits is most significant" of the four factors. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (citations and quotations omitted).

## III. DISCUSSION

In support of their requested injunction, Plaintiffs focus on Count 1, which alleges that Defendants' disciplinary actions violated their rights under the First Amendment, and Count 2, which alleges that Defendants failed to provide Plaintiffs with due process as afforded by the Fourteenth Amendment. The Court will address the *Dataphase* factors below.

5

Case 5:21-cv-06153-SRB   Document 75   Filed 02/08/22   Page 5 of 14

### A. Threat of Irreparable Harm

To demonstrate irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted). It is undisputed that being removed from school via suspension or expulsion harms Plaintiffs. Plaintiffs have an interest in their schooling that is constitutionally protected. *See Goss v. Lopez*, 419 U.S. 565, 574–77 (1975).

Defendants argue that they have mitigated any harm resulting from the suspensions or expulsion. "[Park Hill SD] has allowed the Plaintiffs to coordinate their online work with the District's curriculum and even paid for a homebound teacher to work with the Plaintiffs, thus maintaining connections to the building."[4] (Doc. #65, pp. 15-16.) Defendants continue to provide online schooling until Plaintiffs are eligible for readmission or eligible to apply for readmission.

On balance, the Court finds that Plaintiffs face irreparable harm. Plaintiffs are being deprived of an enriched education by being unable to learn alongside peers and by lacking access to their teachers. Plaintiffs are also unable to participate in extra-curricular activities. Additionally, Plaintiffs are harmed by having a suspension or expulsion on their educational records. *Goss*, 419 U.S. at 575 ("If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."). Thus, the Court finds that Plaintiffs have shown irreparable harm absent injunctive relief.

### B. Likelihood of Success on the Merits

Despite facing irreparable harm, the Court finds that Plaintiffs have not shown they will likely succeed on the merits of their claims. In evaluating the likelihood of success on the merits,

---

[4] The Court notes that one of the Plaintiffs has enrolled in and is attending a nearby parochial high school.

a court does not decide whether the movant will "ultimately win." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991); *see also O'Connor v. Peru State Coll.*, 728 F.2d 1001, 1002 (8th Cir. 1984) (noting that at the preliminary injunction stage, a "court should avoid deciding with any degree of certainty who will succeed or not succeed"). Instead, a court considers whether the movant's position is fairly supported by governing law. *See Glenwood Bridge*, 940 F.2d at 371. Upon review of the record and applicable case law, the Court finds that Plaintiffs have failed to show a likelihood of success on the merits of both their First Amendment and Due Process claims.

1. **Plaintiffs' First Amendment Claim**

Count 1 asserts a violation of Plaintiffs' rights under the First Amendment. "[S]peech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 U.S. 443, 358 (2011). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "Students in school as well as out of school are 'persons' under our Constitution. . . . They may not be confined to the expression of those sentiments that are officially approved." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).

However, "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citation and quotations omitted). "[C]ourts must apply the First Amendment in light of the special characteristics of the school environment." *Mahoney Area Sch. Dist. v. B. L. by and through Levy*, 141 S. Ct. 2038, 2045 (2021). "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to

7

Case 5:21-cv-06153-SRB   Document 75   Filed 02/08/22   Page 7 of 14

freedom of expression of their views." *Tinker*, 393 U.S. at 509. There are four categories of student speech that schools may constitutionally regulate:

> (1) 'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds, . . . (2) speech, uttered during a class trip, that promotes 'illegal drug use,' . . . (3) speech that others may reasonably perceive as 'bear[ing] the imprimatur of the school,' such as that appearing in a school sponsored newspaper . . . [and, (4)] speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.

*Mahoney*, 141 S. Ct. at 2045 (citations omitted). A school may constitutionally regulate speech materially disrupting the school environment upon a showing "that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. (citations and quotations omitted). A school must show that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id*. (citations and quotations omitted).

Finally, a school's ability to regulate student speech is diminished if that speech took place off-campus. Three factors indicate whether speech is "off-campus[:]"

> *First*, a school, in relation to off-campus speech, will rarely stand *in loco parentis*. . . . Geographically speaking, off-campus speech will normally fall within the zone of parents, rather than school-related, responsibility.
>
> *Second*, . . . . [w]hen it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention.
>
> *Third*, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus.

*Mahoney*, 141 S. Ct. at 2046 (emphasis in original). The presence of these features "diminish[es] the strength of the unique educational characteristics that might call for special First Amendment leeway." *Id*.

Turning to the merits of Plaintiffs' First Amendment claim, the Court first finds that the Petition substantially interrupted the school environment such that Defendants could constitutionally regulate Plaintiffs' speech. The Petition picked up national news attention and caused a substantial interference with the operation of PHS. Defendants received emails from concerned parents and reports from teachers stating that children were scared to come to school because of the Petition. One parent wrote to Dr. Herren that her daughter had shown her the Petition and was "now very nervous about going to school." (Doc. #27, p. 10) (citation and quotations omitted). One teacher wrote to Dr. Herren the following:

> I am not sure what is going on with the freshman football [team,] but my third hour class was in uproar about the situation. I have been fighting fires all day. I have several girls crying and [they are] scared for their lives. I'm just not sure [what is] going on besides what students have told me. I could use some help or update on this situation. I have been doing a lot of counseling today and [am] trying to give support[,] but I am concerned about the girls that are scared or crying. Please let me know.

(Doc. #27, pp. 5–6.) Dr. Colvin testified that he would describe the Petition as "in terms of student conduct, [the] most disruptive event that [he has] encountered in [his] almost 10 years" as Director of Student Services at Park Hill SD. (Doc. #65-1, p. 3.)

The Court finds that the record establishes the Petition caused a substantial disruption to PHS and Park Hill SD such that Defendants were justified in disciplining Plaintiffs. However, the Court does not find that the fourteen- and fifteen-year-old boys intended the Petition to be circulated beyond the freshman football team. Adolescent children rarely tend to think about the ramifications of their actions.[5] Rather, the current environment correctly has zero tolerance for racial discrimination.

---

[5] Adolescents "lack maturity and [have] an underdeveloped sense of responsibility . . . often result[ing] in impetuous and ill-considered actions and decisions." *Graham v. Florida*, 560 U.S. 47, 72 (2011) (citation and quotations omitted). They are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citation omitted). *See generally* Steinberg & Scott, Less

Second, the Court finds that Plaintiffs' speech took place on-campus such that Defendants could constitutionally regulate it. Plaintiffs posted and commented on the Petition while riding the bus prior to a school-sponsored activity. The three factors in *Mahoney* weigh toward finding that Plaintiffs' speech took place on-campus: the students were not under parental supervision, were using school-sponsored transportation, and they were participating in a school-sponsored activity. It is likely that, had Plaintiffs "delivered the same speech in a public forum outside the school context, it would have been protected." *Morse v. Frederick*, 551 U.S. 393, 405 (2007); *see also Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 688 (1986) (Brennan, J., concurring in judgment) ("If [the student] had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate"). However, Plaintiffs' "First Amendment rights were circumscribed in light of the special characteristics of the school environment." *Id*. (citing *Tinker*, 393 U.S. at 506).

Finally, Plaintiffs argue that any disruption was not caused by the Plaintiffs but was instead caused by the Defendants' response to the Petition. Plaintiffs argue that Defendants' actions were an intervening cause that resulted in the Petition garnering attention outside of the PHS community, cutting off Plaintiffs' responsibility for the disruption. For example, Plaintiffs contend that the September 22, 2021, email sent by Dr. Cowherd, Superintendent of Park Hill SD, to the "community" condemning the Petition drew unnecessary attention to the incident.

However, the record does not support this contention. Factually, the Petition drew attention from persons outside of the football team before Defendants made any public statement. One football player shared the Petition on his Snapchat story on the day it was created "because this

---

GUILTY BY REASON OF ADOLESCENCE: DEVELOPMENTAL IMMATURITY, DIMINISHED RESPONSIBILITY, AND THE JUVENILE DEATH PENALTY, 58 AM. PSYCHOLOGIST 1009 (2003). Sometimes, adults do not think fully about the ramifications of electronic communications either. (Doc. #64-27.)

10

[had] happened before against [his] race." (Doc. #27, p. 9) (citation and quotations omitted). Another football player stated that "[a]fter the bus ride [home,] people saw what [happened] and that it was all over [people's] snapchat [stories]. Then it was on twitter and kept spreading." (Doc. #27, p. 9) (citation and quotations omitted).

Evidence shows that the Petition was being circulated on Twitter within five hours of its posting on Change.org. (Doc. #27-10.) It is foreseeable that Defendants would address the PHS community's concerns through public statements. Although Plaintiffs' actions were aggravated by social media, Defendants' response in reiterating its policy against harassment and discrimination was not the cause of the disruption to PHS and Park Hill SD. Because the Petition caused a substantial disruption to the operation of PHS such that Defendants did not violate Plaintiffs' constitutional rights in disciplining them, the Court finds that Plaintiffs have not shown a likelihood of success on the merits of their free speech claim.

### 2. Plaintiffs' Due Process Claim

In Count 2, Plaintiffs allege that Defendants violated Plaintiffs' due process rights under the Fourteenth Amendment. "[T]he State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss*, 419 U.S. at 574. In *Goss*, the Supreme Court established that, when facing a suspension of up to ten days, a student is entitled to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id*. at 581. The Supreme Court noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id*. at 584.

11

Case 5:21-cv-06153-SRB   Document 75   Filed 02/08/22   Page 11 of 14

"Though the Court has not since addressed what additional process may be required for longer suspensions," where a student is suspended for longer than ten days or expelled, "federal appellate courts have applied the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976), to determine what additional process may be due." *Doe ex rel. Doe v. Todd Cty. Sch. Dist.*, 625 F.3d 459, 462–63 (8th Cir. 2010) (citation omitted). Under *Mathews*, due process requires "that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard . . . to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (citation and quotations omitted).

Turning to the merits of Plaintiffs' due process claim, the Court finds that Plaintiffs had meaningful opportunity to be heard and present their case. The day after Plaintiffs published and/or commented on the Petition, Defendants called Plaintiffs and their parents into the school to be interviewed about their involvement in the incident. At that point, Plaintiffs admitted their involvement. Additionally, Defendants conducted a hearing in front of the School Board at which Plaintiffs and their parents testified, called witnesses, and presented evidence. Considering that Plaintiffs did not deny their involvement in the Petition, under *Goss*, Defendants only needed to prove Plaintiffs "oral or written notice of the charges against [them.]" *Goss*, 419 U.S. at 581. The parties do not dispute that Defendants gave such notice here.

Plaintiffs argue they were denied due process because their punishments were fundamentally unfair. Plaintiffs argue their expulsion and lengthy suspensions were unwarranted and disproportionate to punishments given out for similar incidents. Evidence introduced at the evidentiary hearing shows that the suspensions given in this case are significantly more severe

than other terms of suspension imposed for similar incidents.[6] The fourteen- and fifteen-year-old boys made a serious error in judgment but could have never envisioned this result. Plaintiffs' punishments, ranging from expulsion to 180-day suspensions, were overly harsh.[7] However, Plaintiffs presented no legal authority showing that the Court may revisit Defendants' actions. Accordingly, the Court finds that Defendants did not violate Plaintiffs' due process rights and that Plaintiffs have not shown the likelihood of success on the merits of their due process claim.[8]

C.  **Balance of Harms and Public Interest**

The remaining two factors weigh in favor of granting Plaintiffs' motion. Defendants argue that if Plaintiffs were to return to school early it would further disrupt the school environment and require Defendants "to devote significant resources to meeting with its students and staff to prepare them for such an event, to minimize the conflict that the Plaintiffs' presence would generate." (Doc. #27, p. 22.)

The balance of harms slightly favors granting Plaintiffs' motion for injunctive relief. As discussed above, Plaintiffs' have interests in their continuing education that are constitutionally protected and suffer irreparable harm from being removed from school. Despite the likelihood of some disruption at PHS upon Plaintiffs' return, Defendants are likely to face these challenges

---

[6] Plaintiffs analyzed all reported incidents characterized as "harassment," including the incident at issue. Plaintiffs found that the suspensions given to three of the four Plaintiffs are 2.3 times longer than the average suspension given for incidents also characterized as harassment. (Doc. #64-7.)

[7] *See e.g. Bethel*, 478 U.S. at 678 (where a student giving a sexually explicit speech at a school assembly was suspended for three days and was prevented from walking at graduation); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 431 (4th Cir. 2013) (where a student was removed from class for wearing clothing displaying the confederate flag); *see also West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223 (D. Kan. 1998) (where a student was suspended for three days after drawing the confederate flag in class); *see also N.J by next friend Jacob v. Sonnabend*, 536 F. Supp. 3d 392, 396 (E.D. Wisc. 2021) (where a student was asked to change after repeatedly wearing clothing depicting firearms); *see also B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 737 (8th Cir. 2009) (where students were sent home after refusing to remove clothing with racist statements).

[8] Injunctive relief would not be warranted even if the Court individually analyzed the other counts asserted by Plaintiffs.

regardless of when Plaintiffs are readmitted to school. Undermining Defendants' argument is the fact that Student X, who was involved in the creation and publication of the Petition, was never disciplined and remains enrolled at PHS. However, the public interest factor seems to weigh in favor of Defendants. Defendants have an interest in sending a message to the student body and the community at large that it takes issues of racial discrimination seriously. Further, Defendants have an interest in "affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in schools." *Tinker*, 393 U.S. at 507 (citations omitted).

Overall, the weighing of all factors indicates that Plaintiffs' motion for injunctive relief should be denied. Plaintiffs have shown they are likely to suffer irreparable harm absent injunctive relief, and the Court finds that the balance of harms weighs in favor of granting injunctive relief. However, Plaintiffs have not shown they are likely to succeed on the merits of their claims and the Court finds that the public interest factor weighs in favor of denying injunctive relief. "[T]he likelihood of success on the merits is most significant" of the four *Dataphase* factors. Plaintiffs have not shown they are likely to succeed on the merits of their claims. Accordingly, the Court finds that an injunction at this stage is inappropriate. *Barrett*, 705 F.3d at 320 (citations and quotations omitted).

### IV. CONCLUSION

Accordingly, it is hereby **ORDERED** that Plaintiffs' request for a preliminary injunction (Doc. #7) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
Dated: February 8, 2022                 UNITED STATES DISTRICT JUDGE