IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| PLAINTIFF A, by his natural mother and general guardian, PARENT A, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 21-cv-6153-SRB ) |
| PARK HILL SCHOOL DISTRICT, et al., | ) ) |
| Defendants. | ) ) |

## ORDER

Before the Court is Defendants Park Hill School District ("the District"), Janice Bolin, Bart Klein, Kimberlee, Ried, Todd Fane, Scott Monsees, Susan Newberger, Brandy Woodley, Dr. Jeanette Cowherd, Dr. Josh Colvin, and Dr. Kerrie Herren's (collectively, "Defendants) Motion for Summary Judgment. (Doc. #137.) For the reasons stated below, the motion is GRANTED.

## I. BACKGROUND

For the purpose of resolving the pending motion, the following facts are uncontroverted or deemed uncontroverted by the Court. The relevant facts are taken from the record, including the parties' briefs and exhibits. Only those facts necessary to resolve the pending motion are discussed below and are simplified to the extent possible. Additional facts relevant to the parties' arguments are set forth in Section III.

### A. The Parties

The District is a public school district in Platte County, Missouri, which includes Park Hill South High School ("PHS"). During the 2021–2022 academic year, Plaintiff A, Plaintiff B, Plaintiff C, and Plaintiff D (collectively, "Plaintiffs")[1] were ninth-grade students at PHS and were

---
[1] The minor Plaintiffs and their parents proceed anonymously pursuant to the Court's prior Order. (Doc. #5.)

members of PHS's ninth-grade football team. Plaintiff A is biracial, African-American and Brazilian. Plaintiff B and C are white. Plaintiff D is biracial, white and Asian.

Defendants Janice Bolin ("Bolin"), Bart Klein ("Klein"), Kimberley Ried ("Ried"), Todd Fane ("Fane"), Scott Monsees ("Monsees"), Susan Newburger ("Newburger"), and Brandy Woodley ("Woodley") are members of the Park Hill School District Board of Education ("the Board"). Also named as defendants are Dr. Jeanette Cowherd ("Dr. Cowherd"), the Superintendent of the District; Dr. Josh Colvin ("Dr. Colvin"), the Director of Student Services at the District; and Dr. Kerrie Herren ("Dr. Herren"), the Principal at PHS.

B.  **The District's Policies**

The District maintains an anti-discrimination policy ("the Anti-Discrimination Policy") and student discipline policies ("the Discipline Policies"), collectively ("the Policies"). The Anti-Discrimination Policy prohibits both employees and students from discriminating or harassing others based on race.[2] The Discipline Policies prohibit "uncivil behavior,"[3] "disorderly conduct,"[4] and "harassment."[5] The Discipline Policies also forbid cell-phone use for non-academic purposes.

---

[2] The Anti-Discrimination Policy specifies certain behaviors that could constitute illegal harassment if based on race, including "display of written materials, pictures or electronic images; name calling, teasing or taunting; insults, derogatory remarks or slurs; gestures; [and] threatening, intimidating or hostile acts[.]" (Doc. #138-4, pp. 5–6.)

[3] The Discipline Policies define "uncivil behavior" as "any behavior that is (1) physically or verbally threatening, either overtly or implicitly, as well as behavior that is coercive, intimidating, violent or harassing, and (2) directed toward employees, students, parents/guardians, patrons, visitors or anyone having business with the district." (Doc. #138-7, p. 2.) Examples of "uncivil behavior" include "(1) use of profanity; (2) personally insulting remarks; (3) attacks regarding a person's race. . . ; or (4) behavior that is out of control. Such behavior could occur during telephone conversations, voice mail messages, voice mail messages, face-to-face conversations, written letters and/or email messages." (Doc. #138-7, p. 2.)

[4] The Discipline Policies define "disorderly conduct" as "[d]isorderly, rude, vulgar, or inappropriate behavior that is intention or reckless and substantially or materially disrupts the school environment." (Doc. #138-8, p. 86.)

[5] The Discipline Policies define "harassment" as "when the school environment becomes permeated with intimidation, ridicule or insult that is sufficiently sever or pervasive enough that it unreasonably alters the educational environment." (Doc. #138-8, p. 91.) Examples of harassment include "display of written material, pictures, or electronic images; name calling, teasing or taunting; insults, derogatory remarks or slurs; jokes; gestures; [and] threatening, intimidating or hostile acts[.]" (Doc. #138-8, p. 91.)

The Discipline Policies provides that violations may be punished with student suspensions, both in-school and out-of-school. Plaintiffs were aware and signed a copy of the Policies.

In imposing punishments for violations of the Policies, the District considers the Parent/Student Handbook's "Discipline Cheat Sheet," which lists standard punishments for violations of the District's Policies. (Doc. #138-11, p. 2.) The District also considers the "scope" and "sequence" of the violation, and the "totality of the circumstances." (Doc. #138-10, p. 3.) Colvin testified that punishments are considered "on a case-by-case basis" based on the "intent," "context," and "impact of the incident." (Doc. #138-10, p. 3.) The Discipline Cheat Sheet provides that all violations can result in a recommendation for long-term suspension, or a suspension lasting longer than ten days.

Dr. Cowherd or Dr. Colvin may recommend a long-term suspension, which Dr. Cowherd must ultimately approve. Dr. Cowherd testified that, in recommending a long-term suspension, they "try to look at other cases that occurred to see if there's any other patterns or precedents that have been set in those matters." (Doc. #138-13, p. 4.) When dealing with violations involving racist conduct, Dr. Cowherd and Dr. Colvin consider other incidents that were classified as "harassment." (Doc. #138-13, p. 5.)

C.  **The Petition**

On September 16, 2021, Plaintiffs traveled on a school bus to an afternoon football game. Plaintiffs A, B, and C were on one bus ("Bus One") together, while Plaintiff D was on other bus ("Bus Two"). While travelling to the game, the team members were sending Snapchat messages and videos back-and-forth between Bus One and Bus Two. Plaintiff A testified that he heard two students, K.S. and T.R.L., joking about T.R.L. needing a job.[6] Plaintiff A testified that either K.S.

---

[6] Pursuant to the Court's prior Order (Doc. #47), the Court will refer to all minor witnesses by their initials.

or T.R.L. "brought up slavery because [T.R.L. is] African-American." (Doc. #138-3, p. 5.) Plaintiff A testified that T.R.L. jokes about his race "pretty often" and that K.S. and T.R.L.'s "jokes back and forth about slavery" gave him "the idea to make [a] petition with T.R.L." (Doc. #138-3, p. 6.)

While on Bus One, Plaintiff A published a petition on Change.org titled "Start slavery again" ("the Petition"). Plaintiff A testified that he discussed the Petition with T.R.L. before publishing it, and that T.R.L. "laughed about it" and "was fine with it." (Doc. #138-3, p. 7.) When creating a petition, Change.org prompts the creator to upload a picture, state the target audience, and state who would benefit. Plaintiff A uploaded a photo of T.R.L. as the Petition's cover photo, and testified that he had T.R.L.'s permission to use the photo. Plaintiff A also wrote the target audience was "Racist men" and that the Petition would benefit "white men." Plaintiff A testified that T.R.L. encouraged him to write that the target audience for the Petition was "Racist men." (Doc. #138-3, p. 8.)

Plaintiff A circulated the Petition among the ninth-grade football team via Snapchat. Plaintiffs B, C, and D posted comments on the Petition's webpage. Plaintiff B commented "I love slavery." (Doc. #138-16, p. 3.) Plaintiff C commented "i hate blacks." (Doc. #138-16, p. 3.) Plaintiff D commented "I want a slave." (Doc. #138-16, p. 3.) Change.org records indicate that T.R.L. and two other students signed the Petition. A fellow student testified that Plaintiffs intended the Petition to be a joke, but that it was offensive. (Doc. #138-18, p. 3.) The Petition spread virally over social media, news outlets began reporting on the Petition, and the story drew national media attention. The same day, the Petition was posted on Twitter in a tweet also tagging PHS and the District. Dr. Herron began receiving complaints from students and parents regarding the Petition.

4

On September 17, 2021, the following day, Dr. Herron received emails reporting students were scared to be at PHS. Dr. Herren instructed PHS's Assistant Principal, Melvin Walker ("Walker"), to investigate the Petition. Walker spoke with Plaintiffs and determined they had violated the District's Policies. Plaintiffs did not inform Walker of T.R.L.'s alleged involvement in the creation of the Petition. Walker issued discipline notices to Plaintiffs, informing them that they would be suspended for ten days and recommending long-term suspension or expulsion. (Doc. #138-28.) That evening, Dr. Herren sent an email to the parents of PHS students condemning the Petition as "unacceptable and racist statements[.]" (Doc. #144-26, p. 1.)

On September 20, 2021, Dr. Herren sent Plaintiffs' parents letters informing them of their children's suspensions and the recommendation of long-term suspension or expulsion. The letters stated that:

> The discipline has been imposed as a result of . . . Harassment, Disruptive Behavior, Disorderly conduct, and Cell Phone / Electronic Device. This conduct is unacceptable behavior, pursuant to Park Hill Disciplinary Policy JG, as it is prejudicial to good order and discipline or tends to impair the morale and good conduct of students.

(Doc. #138-29, p. 3.) On September 21, 2021, Plaintiffs' parents were notified that disciplinary conferences were to be held on October 1, 2021, were given a "Notice of Charges," and were provided with an outline of procedures for disciplinary conferences. (Doc. #138-30.) The Notice of Charges stated:

> [Your Student] has been suspended for ten days out of school with a recommendation to the Superintendent of Schools for an extended term suspension and/or expulsion. This discipline has been imposed as a result of [Your Student's] Harassment, Disruptive Behavior, Disorderly Conduct, Cell Phone/Electronic Device. These charges are in violation of the following school board policies: . . . Policy JG – Student Discipline[,] . . . Policy AC – Harassment[,] . . . Policy KFA – Community Relations[.] The disciplinary incident that resulting in this recommendation to the Superintendent occurred on Thursday, September 16, 2021.

(Doc. #138-30, p. 4.) On September 22, 2021, Dr. Cowherd, Superintendent of the District, emailed a letter to the community condemning the Petition and stated that, while she could not "share the specifics about any particular student's discipline," she could say they were going to "follow our Board policy," which "may include suspension or expulsion." (Doc. #144-16, p. 1.)

On October 1, 2021, the District held disciplinary conferences with Plaintiffs and Plaintiffs' parents. Plaintiffs were given the opportunity to explain their conduct surrounding the Petition. Following the disciplinary conferences, Dr. Cowherd and Dr. Colvin agreed that Plaintiff A should be suspended for 170 days, or the remainder of the academic year, and recommended to the Board that Plaintiff A should be expelled. Dr. Cowherd and Dr. Colvin agreed that Plaintiffs B, C, and D should be suspended for 170 days. In making this decision, Dr. Cowherd and Dr. Colvin considered two other incidents as comparators. The first incident involved a student writing racist and threatening graffiti[7] on school bathroom walls and resulted in the student being recommended for expulsion. The second incident involved a student drawing swastikas on school bathroom walls and resulted in the student being expelled. In addition to these two comparators, Dr. Cowherd and Dr. Colvin considered Plaintiffs' age, maturity, intent, and the impact of the Petition. Plaintiffs appealed their punishments.

On November 3, 2021, the District held an appeal hearing with Plaintiffs, their parents, and legal counsel. All seven members of the Board presided over the appeal hearing. The Board and Plaintiffs were allowed to call and cross-examine witnesses. Plaintiffs did not inform the Board of T.R.L.'s alleged involvement in the creation of the Petition. The hearing lasted from 5:00PM to 3:00AM. After deliberation, the Board determined that Plaintiffs had violated the District's Policies by engaging in harassment, disorderly conduct, and disruptive behavior. The Board

---

[7] The graffiti contained racially explicit language and specific threats of gun violence.

6

Case 5:21-cv-06153-SRB   Document 150   Filed 01/06/23   Page 6 of 15

expelled Plaintiff A, and denied Plaintiffs B, C, and D's appeals. In order for Plaintiffs B, C, and D to return to school for the 2022-2023 academic year, the Board required they undergo ten hours diversity and inclusion training.

The District coordinated with an accredited online public school, Missouri Connections Academy ("MCA"), to allow Plaintiffs to receive educational services during the 2021-2022 academic year. Plaintiffs were permitted to transfer MCA credits to PHS. The District also provided Plaintiffs' access to PHS' counselors.

**D.    The Instant Action**

On November 12, 2021, Plaintiffs filed suit against Defendants and assert the following claims pursuant to 42 U.S.C. § 1983: (1) violation of the First Amendment; (2) violation of the Fourteenth Amendment Due Process; (3) violation of the Fourteenth Amendment Equal Protection, asserted by Plaintiffs B, C, and D only; and (4) Failure to Train and Supervise, or Inadequate Training and Supervision.

On November 12, 2021, Plaintiffs also filed a motion for a preliminary injunction, requesting that the Court require Defendants to readmit Plaintiffs to PHS. (Doc. #7.) On January 31, 2021, the Court presided over oral arguments regarding Plaintiffs' motion for a preliminary injunction. On February 8, 2022, the Court denied Plaintiffs' motion. (Doc. #75.)

At the January 31 oral arguments, Defendants learned for the first time of T.R.L.'s alleged involvement in the creation of the Petition. Based on this new information, T.R.L. was deposed and testified that he did not remember any jokes of him needing a job or about slavery. T.R.L. testified that he first saw the Petition while Plaintiff A was creating it because he "looked over [Plaintiff A's] shoulder" while Plaintiff A, Plaintiff B, and another student, G.S., "were laughing and talking about" the Petition. (Doc. #138-41, p. 6.) T.R.L. testified that he "did not laugh about

7

it," that no one asked him whether he thought the Petition should be posted, and that he did not consent to his photo being posted on the Petition. (Doc. #138-41, pp. 6–7.) T.R.L. testified that other students on the bus told Plaintiff A to take the Petition down because "people were going to get in trouble" and that it would prevent the students from getting into college. (Doc. #138-41, p. 9.) T.R.L. testified that he signed the Petition and that he intended to "comment on [the Petition] and say that [he] was a coach and say that whoever signed the [P]etition would be running, but [he] didn't comment[.]" (Doc. #138-41, p. 10.) T.R.L. testified that he shared the Petition with a student who did not have a Snapchat account, but did not encourage others to sign it.[8]

Plaintiffs B, C, and D have enrolled in other schools. Plaintiff A remains expelled from PHS. Defendants represent they are considering readmitting Plaintiff A to PHS. On September 30, 2022, Plaintiffs dismissed Counts I and IV. (Doc. #131; Doc. #132.) On November 14, 2022, Defendants filed the instant motion for summary judgment as to Counts II–III. Plaintiffs oppose the motion. The parties' arguments are addressed below.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of identifying "the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up). If the moving party makes this showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted). "Credibility determinations, the weighing

---

[8] If a Change.org user shares a petition, the link to that petition is accompanied with an automatically-generated invitation to sign it.

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quotation marks omitted).

## III. DISCUSSION

### A. Count II

Defendants argue that they are entitled to summary judgment on Count II, alleging a violation of Plaintiff's due process rights. Plaintiffs disagree. The Court will address the parties' arguments as to procedural due process and substantive due process separately below.

#### 1. Procedural Due Process

Defendants argue that Plaintiffs' procedural due process claim fails because Plaintiffs were provided "far more process than was required under the U.S. Constitution[.]" (Doc. #138, p. 29.) Plaintiffs disagree, arguing that the notices given to Plaintiffs failed to "disclose important information" and that the District's Policies were improperly applied in determining Plaintiffs' punishments.

"[T]he State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). "[D]ue process requires, in connection with a suspension of 10 days or less, that the student by given oral or written notice of the charges against him and, if he denies them, and explanation of the evidence the authorities have and an opportunity to present his side." *Id.* at 581. Since *Goss* did not address longer suspensions or expulsions, "federal appellate courts have applied the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine what additional process may be due." *Doe ex rel. Doe v. Todd Cty. Sch. Dist.*, 625 F.3d 459, 462–63 (8th Cir. 2010) (citation omitted). Under

9

Case 5:21-cv-06153-SRB    Document 150    Filed 01/06/23    Page 9 of 15

*Mathews*, due process requires "that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard . . . to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (citation and quotations omitted).

The Court finds that there is no genuine dispute of material fact that Plaintiffs had a meaningful opportunity to present their case. As stated in the Court's prior order:

> The day after Plaintiffs published and/or commented on the Petition, Defendants called Plaintiffs and their parents into the school to be interviewed about their involvement in the incident. At that point, Plaintiffs admitted their involvement. Additionally, Defendants conducted a hearing in front of the School Board at which Plaintiffs and their parents testified, called witnesses, and presented evidence. Considering that Plaintiffs did not deny their involvement in the Petition, under *Goss*, Defendants only needed to prove Plaintiffs "oral or written notice of the charges against [them.]" *Goss*, 419 U.S. at 581. The parties do not dispute that Defendants gave such notice here.

(Doc. #75, p. 12.)

The Court finds that the notices provided to Plaintiffs comport with the requirements of due process. Defendants provided Plaintiffs with written notice of the charges against them, held a disciplinary proceeding in which Plaintiffs were given the opportunity to explain their conduct. Plaintiffs were permitted to appeal their punishments and were represented by counsel, permitted to cross-examine the witness presented, and offered the opportunity to present evidence in support of their cases. Considering that Plaintiffs did not deny their involvement in the Petition, the Court finds that Defendants have not violated Plaintiffs' procedural due process rights.

The Court disagrees with Plaintiffs that Defendants unconstitutionally considered the media backlash resulting from the Petition. Plaintiffs present no legal authority prescribing what factors a school may consider in school disciplinary proceedings. Although Plaintiffs attempt to characterize the media attention drawn by the Petition as caused by Defendants, the Court disagrees. Evidence shows that the Petition was circulating on social media and was creating

disruptions in the classroom before Defendants made any public statements regarding the Petition. Additionally, as discussed in more detail below, Plaintiffs' argument that the District failed to disclose evidence regarding T.R.L. has no merit. "Plaintiffs had every opportunity to implicate T.R.L. throughout the disciplinary process." (Doc. #149, p. 65.) Ultimately, "[i]t is not the purpose of this Court to step in and rehear the evidence and rethink the decision of school board officials." *Sykes v. Sweeney*, 638 F. Supp. 274, 279 (E.D. Mo. 1986).

Because the Court finds no genuine dispute of material fact as to whether Defendants denied Plaintiffs procedural due process, the Court finds that summary judgment is warranted in favor of Defendants.

### 2. Substantive Due Process

Defendants argue that Plaintiffs' substantive due process claim fails because the District's disciplinary decisions were "based on the legitimate purpose of ensuring an educational environment free of discrimination." (Doc. #138, p. 32.)[9] Plaintiffs disagree, arguing that they were unconstitutionally punished for "participating in the joking of 14- and 15-year-olds, and the context was interracial good-humored and friendly bantering without any suggestion of demeaning or hurtful acts." (Doc. #144, p. 81.)

To prove a violation of substantive due process rights, a plaintiff must show (1) a violation of "one or more fundamental constitutional rights," and (2) that the conduct constitution the violation "was shocking to the 'contemporary conscience.'" *Flowers v. City of Minneapolis, Minnesota*, 478 F.3d 869, 873 (8th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S.

---

[9] Defendants also argue they are entitled to summary judgment on Count II because "the District's behavior policy and guidelines gave sufficient notice of prohibited conduct" and because "Plaintiffs' use of cell phones did not factor into their discipline." (Doc. #138, pp. 28, 30.) Plaintiffs do not respond to these arguments. For the reasons stated below and in Defendants' briefs, the Court finds that summary judgment is warranted on Count II in Defendants' favor.

11

833, 847 n.8 (1998)). Because the right to a public education has been held to be a property interest and not a fundamental right, Plaintiffs "must show that there was no rational basis for [Defendants'] decision or that the decision was motivated by bad faith or ill will." *Disesa v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95 (8th Cir. 1996); *see Goss*, 419 U.S. at 574; *see also Friends of Lake View School Dist. Incorporation No. 25 of Philips Cty. v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009) ("[T]he Supreme Court has rejected the proposition that education is a fundamental right under the Fourteenth Amendment[.]").

Defendants argue that Plaintiffs' punishments are rationally related to Plaintiffs' conduct because they published a racially inflammatory Petition during a school activity that caused a substantial disruption in the school environment. The Court agrees. Defendants have "the comprehensive authority . . . to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 383 U.S. 503, 507 (1969) (citations omitted). Defendants maintained Policies that prohibited discriminatory and racist behavior. It is undisputed that Plaintiffs created the Petition containing racially inflammatory statements. The record indicates that the Petition caused a disruption and fear among the students at PHS and was shared on social media. Plaintiffs have presented no evidence that would allow a jury to infer Defendants' actions were shocking to the contemporary conscience, other than the severity of the punishment. Considering that Defendants have an interest in maintaining an orderly educational environment, the Court finds that there was a rational basis for Defendants' decision to punish Plaintiffs. Ultimately, the Court agrees with Defendants that "[t]he Board's focus on the magnitude of the disruption Plaintiffs caused was a rational basis for the discipline it imposed." (Doc. #149, p. 70.)

Plaintiffs argue that the Petition was intended as a joke and that they received overly harsh punishments. It may be true that Plaintiffs, fourteen- and fifteen-year-old boys, made a serious

12

error in judgment and could have never envisioned this result. However, Plaintiffs presented no legal authority showing that the Court may revisit Defendants' actions. Under controlling law, Plaintiffs' punishment does not constitute a violation of Plaintiffs' substantiative due process rights: "Even considering [Plaintiffs'] contention that the school officials' action might have been harsh or unwise in view of the circumstances, the decision was not so flawed that it bore no rational relationship to [Plaintiffs'] offense." *Vann ex rel. Vann v. Stewart*, 445 F.Supp.2d 882, 890 (E.D. Tenn. 2006). The District Court's job is not to create new case law that would allow for the second-guessing of the severity of the punishment handed down by a school district.

For the reasons stated above and in Defendants' briefs, the Court finds that Defendants are entitled to summary judgment on Count II.

**B.  Count III**

Defendants argue they are entitled to summary judgment on Count III, in which Plaintiffs B, C, and D allege a violation of equal protection. Defendants argue that Plaintiffs B, C, and D (1) have not identified a similarly situated student and (2) cannot show that Defendants acted with a racially discriminatory motive. Plaintiffs disagree. The parties' arguments are discussed separately below.

When evaluating an equal protection claim dealing with education, context is important "in determining whether the alleged intentional disparate treatment is actionable or rather a permissible exercise of discretion." *Mathers v. Wright*, 636 F.3d 396, 400 (8th Cir. 2011). "Thus, it is within the context of the classroom setting of this case that we review [Plaintiffs'] allegations that, on account of [Defendants'] irrational and arbitrary animus[,]" Defendants "intentionally treated [Plaintiffs] differently[.]" *Id.*

"[T]he first step in an equal protection case is determining whether the plaintiff[s] ha[ve] demonstrated that [they] w[ere] treated differently than others who were similarly situated[.]" *Klinger v. Dep't of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994) (citation omitted). "Absent a threshold showing that [they are] similarly situated to those who allegedly receive favorable treatment, the plaintiff[s] [do] not have a viable equal protection claim." *Id.* (citation omitted). "[T]he two groups must be similarly situated 'in all relevant aspects.'" *Carter v. Arkansas*, 392 F.3d 965, 969 (8th Cir. 2004) (quoting *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994)).

The Court finds that Plaintiffs B, C, and D and T.R.L. are not similarly situated in one vital relevant aspect: their involvement in the creation of the Petition differs. Plaintiffs B, C, and D not only supported but took affirmative action in writing racist comments the Petition. In contrast, T.R.L. signed the Petition and his signature was not publicly visible. Additionally, Plaintiffs B, C, and D admitted their participation in the Petition where T.R.L. has denied any participation. *See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3rd Cir. 2005) (finding two students not similarly situated where one "admitted to some form of misconduct" and the other "did not"). As Plaintiffs B, C, and D have not shown that they are similarly situated in all relevant aspects to T.R.L., the Court finds that summary judgment is warranted on Count III in favor of Defendants.

However, even if T.R.L. was similarly situated to Plaintiffs, the Court agrees with Defendants in that Plaintiffs have failed to present evidence of a racially discriminatory motive. Plaintiffs have not presented evidence that Defendants' decision to punish Plaintiffs but not T.R.L. "exceeds the scope of professionally acceptable choices and stems from an improper personal motivation." *Mathers*, 636 F.3d at 402. The record shows that Plaintiffs did not inform Defendants of T.R.L.'s alleged involvement in the creation of the Petition at any stage of Defendants'

14

investigation or during Plaintiffs' appeal hearing. The record shows that Defendants discovered T.R.L.'s alleged involvement after the hearing on Plaintiffs' motion for preliminary injunction before this Court on January 31, 2021, which cuts against Plaintiffs B, C, and D's claim. Other than the fact that T.R.L. was not punished, Plaintiffs B, C, and D present no evidence of an improper personal motivation in their punishment. For the reasons stated above and in Defendants' briefs, the Court finds that summary judgment is warranted in favor of Defendants on Count III.[10]

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment (Doc. #137) is GRANTED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
Dated: January 6, 2023        UNITED STATES DISTRICT JUDGE

---

[10] As the Court finds that summary judgment is warranted on Count III, the Court need not address the parties' arguments regarding whether Plaintiffs have established municipal liability.